**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-60502
_____

CITY OF DALLAS, TEXAS,

Petitioner,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.


* * * * * * * * * * * * * * * * * * * *


_____

No. 96-60581
_____

CITY OF DALLAS, TEXAS,

Petitioner,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.


* * * * * * * * * * * * * * * * * * * *

_____

No. 96-60844
_____

NATIONAL CABLE TELEVISION ASSOCIATION, INC.,

Petitioner,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.


BELLSOUTH TELECOMMUNICATIONS, INC.,

Petitioner,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.


UNITED STATES CONFERENCE OF MAYORS
and
NATIONAL ASSOCIATION OF TELECOMMUNICATIONS OFFICERS AND ADVISORS,

Petitioners,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.
_____

Petitions for Review of Orders of the

2

Federal Communications Commission
_____
January 19, 1999

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The petitioners seek review of two orders of the Federal Communications Commission ("FCC" or "Commission") interpreting the open video system ("OVS") provisions of the Telecommunications Act of 1996 ("the Act"), Pub. L. No. 104-104, 110 Stat. 56 (1996).[1] We grant the petitions for review and affirm in part and reverse in part the Commission's orders.

## I.   Introduction.

Consistent with the Act's primary goal of encouraging competition in networked communication industries, the OVS pro- visionsSSchiefly § 653 of the Act, 47 U.S.C. § 573SSaim to encourage local exchange carriers ("LEC's") to enter the market for video programming delivery as OVS service providers.  OVS's, which are designed to compete with traditional cable television service, resemble both common carriers and cable systems:  Like common carriers, they must share carriage capacity with unaffiliated programming providers, but they may provide some programming of

---

[1] *See Implementation of Section 302 of the Telecommunications Act of 1996*, *Second Report and Order*, FCC 96-249 (released June 3, 1996) ("Rulemaking Order"), *on reconsideration*, *Third Report and Order*, FCC 96-334 (released Aug. 8, 1996) ("Reconsideration Order").

their own, as cable companies may do. *See* 47 U.S.C. § 573(b)(1)(A).

To hasten the development of OVS's, Congress directed the FCC to "complete all actions necessary (including any reconsideration) to prescribe regulations" governing OVS's "[w]ithin 6 months after" February 8, 1996, "the date of enactment of the [1996 Act]." 47 U.S.C. § 573(b)(1). Pursuant to this command, the agency promulgated the orders under review.

Five petitioners challenge various aspects of the orders. The challenges fall into three categories. The National Association of Telecommunications Advisors and Officers ("NATOA"), the City of Dallas, and the U.S. Conference of Mayors (collectively, the "Cities") complain of the impact of the Commission's OVS rules on local governments. The National Cable Television Association ("NCTA") challenges the agency's treatment of cable operators under the OVS rules. Finally, BellSouth, a LEC, attacks the requirement that OVS operators obtain FCC approval of their certifications before commencing construction related to their OVS's.

Agreeing with the Cities that the FCC exceeded its statutory authority in granting OVS operators an enforceable right of access to local rights-of-way, we reverse the rule preempting local franchise requirements for OVS's. While we do not decide the issue of what additional fees localities may charge OVS operators, we affirm the limitations on fees localities may charge pursuant to

4

§ 653(c)(2)(B) of the Act, 47 U.S.C. § 573(c)(2)(B). We also affirm the FCC's decision not to authorize local governments to require OVS operators to provide institutional networks.

As for NCTA's claims, we reverse the agency's determination that LEC's who are also cable operators may not provide OVS service in the absence of effective competition. We invalidate and remand the Commission's rules generally prohibiting in-region cable operators from providing video programming on unaffiliated OVS systems but permitting OVS operators to waive this prohibition. We affirm, however, the rule prohibiting non-LEC cable operators who do not face effective competition from operating OVS systems, and the rule imposing the effective competition requirement on cable operators whose franchises have expired. As BellSouth urges, we reverse the requirement that carriers obtain the Commission's approval before constructing new physical plants needed to operate OVS systems.

## II. Historical Background of the OVS Provisions.

We begin by tracing the history of cable regulation and considering how OVS service differsSSboth in how it operates and in how it is regulatedSSfrom traditional cable service and from common carriers. Cable television first became publicly available in the 1950's. For more than a decade, the FCC refrained from regulating the new service, believing it lacked authority to do so under either the common carrier provisions of title II of the Communica-

5

tions Act or the radio transmission provisions of title III.

By the mid-1960's, however, the FCC had concluded that it could not effectively discharge its statutory duty to regulate broadcasting in the public interest without regulating cable, whose proliferation could significantly affect broadcasting. The Supreme Court upheld the agency's authority to adopt cable regulations that were "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968). In 1970, the Commission, concerned with preventing the expansion of local monopolies, adopted rules prohibiting telephone companies from providing cable service in their telephone service areas (the "cable-telephone company cross-ownership ban").

Almost twenty years after the FCC began regulating cable, Congress weighed in for the first time, enacting the Cable Communications Policy Act of 1984, which added title VI provisions governing cable operators to the Communications Act. To preserve the role of municipalities in cable regulation, title VI provided that, with limited exceptions, "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1). Title VI also codified the cable-telephone company cross-ownership ban.[2]

---

[2] *See* 47 U.S.C. § 533(b) (1985), *repealed by* Telecommunications Act of 1996
(continued...)

The robust growth of the cable industry in the 1980's caused the FCC to reassess the need for the cable-telephone company cross-ownership ban, and in 1992 the Commission recommended that Congress lift the ban. When Congress did not immediately do so, the FCC amended its rules to permit the provision of "video dialtone," a new service that would offer video programming over telephone company facilities without violating the cross-ownership restriction.

The Commission planned to regulate video dialtone under title IISSthe common carrier provisions of the Communications Act. Despite the Commission's good intentions, the video dialtone policy failed to provide any significant competition for cable systems. Meanwhile, incumbent cable operators largely maintained their monopoly positions.

Faced with this situation, Congress, in enacting the Telecommunications Act of 1996, sought to introduce competition into the market for video programming delivery. Most significantly, the statute repealed § 613(b), 47 U.S.C. § 533(b), the cable-telephone company cross-ownership ban. *See* 1996 Act, § 302(b)(1). In addition, § 653 of the 1996 Act, 47 U.S.C. § 573, created a new method for entry into the market for video programming delivery: the OVS.

---

[2](...continued)
§ 302(b)(1), Pub. L. No. 104-104, 1996 U.S.C.C.A.N. (110 Stat. 124) (hereinafter "1996 Act").

7

Section 653 distinguishes OVS operators from common carriers of video programming and traditional cable operators. Unlike common carriers, OVS operators may select some of the video programming transmitted over their systems; but, unlike cable operators, OVS operators must make most of the channel capacity on their systems available to unaffiliated video programming providers on a nondiscriminatory basis. *See* 47 U.S.C. § 573(b)(1)(A). If demand for OVS channel capacity exceeds supply, an OVS operator may select programming for no more than one-third of the system's channel capacity. *See* 47 U.S.C. § 573(b)(1)(B).

In other respects, OVS operators face fewer regulatory burdens than do common carriers or cable operators. OVS operators are exempt from the title II requirements governing common carriers. *See* 47 U.S.C. § 573(c)(3). In addition, a number of the title VI obligations imposed on traditional cable operatorsSSincluding the franchise requirement under § 621 and the payment of franchise fees under § 622SSdo not apply to OVS operators. *See* 47 U.S.C. § 573(c)(1)(C).

The Act does provide for some continued local regulatory authority. Section 653 permits local governments to assess fees on the gross revenues of OVS operators "in lieu of" cable franchise fees, *see* 47 U.S.C. § 573(c)(2)(B), and § 601(a) of the Act specifically provides that the amendments shall not impliedly preempt state or local law, *see* 47 U.S.C. § 152(c)(1).

8

### III. Standard of Review.

Most of the petitioners' claims involve the question whether the FCC had statutory authority to adopt various regulations in the orders under review. When statutory construction is at issue, we must review the Commission's interpretation under the standard articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), under which we first must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. Where the intent of Congress is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

In resolving this question, we "may not substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Instead, we generally must defer to the agency's interpretation unless it is "manifestly contrary to the statute." *Id.* at 844. The petitioners bear the "difficult burden" of proving that the FCC's interpretation of an ambiguous statutory provision conflicts

with the statutory scheme.[3]

#### IV. The Cities' Claims.

The petitioners representing the interests of local govern-mentsSSthe City of Dallas, the U.S. Conference of Mayors, and NATOASScomplain of the effects of the FCC orders on local govern-ment. They assert that the FCC erred (1) in exempting OVS operators from local franchise requirements; (2) in limiting the compensation localities may recover under § 653(c)(2)(B) for use of local rights-of-way; (3) in failing to authorize local governments to require OVS operators to provide institutional networks; and (4) in adopting rules that permit entities other than LEC's to become OVS operators.

#### A. Exemption of OVS Operators from Franchise Requirements.

The Cities assert that the Commission exceeded its statutory authority in exempting OVS operators from local franchise require-ments. In the alternative, they claim that the agency's resolution of this issue violates the Fifth and Tenth Amendments to the Constitution. Because we agree with the Cities that the preemption of local franchising authority violates the plain meaning of the

---

[3] *See Sta-Home Home Health Agency, Inc. v. Shalala*, 34 F.3d 305, 309 (5th Cir. 1994) (*quoting Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 325 (5th Cir. 1984)).

statutory text, we do not reach the Cities' constitutional arguments.

Section 653(c)(1)(C) of the 1996 Telecommunications Act states that, with a few exceptions, parts III and IV of title VI shall not apply to OVS operators. *See* 47 U.S.C. § 573(c)(1)(C). Included in the title VI provisions that do not apply is § 621(b)(1), which provides that, with some minor exceptions, "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1). Based on the interplay of these statutory provisions, the FCC reasoned that "[a]ny State or local requirements . . . that seek to impose Title VI 'franchise-like' requirements on an open video system operator would directly conflict with Congress' express direction that open video system operators need not obtain local franchises as envisioned by Title VI." *Rulemaking Order* ¶ 211.

The Commission thus concluded that once it has certified an entity as an OVS operator, that entity has an enforceable right to access the right-of-way. That enforceable right is not subject to local franchising authority. *Id.; Reconsideration Order* ¶ 193.

The FCC's preemption of local franchising requirements is at odds with the Act's preservation of state and local authority and with a "clear statement" principle the Supreme Court has articulated. Section 601(c)(1) of the Act, which was adopted at the same time as § 653, directs that "the amendments . . . shall not be

11

construed to modify, impair, or supersede Federal, State or local law unless expressly so provided in such Acts or amendments." 1996 Act, § 601(c)(1). We conclude that § 653(c)(1)(C)'s statement that parts of title VI, including § 621, shall not apply to OVS operators does not constitute the express preemption of local franchising authority that § 601(c) requires.

Section 621 states that a cable operator may not provide cable service without a franchise. This amounts to a *federal* requirement that a cable operator obtain a franchise from a local authority before providing service. Eliminating § 621 results in the deletion of the federal requirement that cable operators get a franchise before providing service; it does not eviscerate the *ability* of local authorities to impose franchise requirements, but only their *obligation* to do so. Consequently, simply saying that § 621 shall not apply to OVS operators does not expressly preempt local franchising authority, as § 601(c)(1) requires.

The FCC's broad reading of preemptive authority also conflicts with Supreme Court precedent. In *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the Court held that if Congress intends to preempt a power traditionally exercised by a state or local government, "it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 460 (*quoting Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989)). In this statute, Congress certainly did not provide the clear statement that *Gregory*

12

requires. Because § 601(c)(1) and *Gregory* prohibit implied preemption, and because § 653(c)(1)(C) expressly preempts only the federal requirement of a local franchise, not the localities' freedom to impose franchise requirements as they see fit, the Commission erred in ruling that § 653 prohibits local authorities from requiring OVS operators to obtain a franchise to access the locally maintained rights-of-way.

The Commission argues that the position we adopt is based on "the flawed premise that local governments possess cable franchising authority independent of § 621." Without citing any authority,[4] the agency states that "[a]fter the 1984 Cable Act added Title VI to the Communications Act, Section 621 became the exclusive source of local franchising authority over cable operators," *id.*, so § 653(c)(1)(C)'s directive that § 621 "shall not apply" to OVS operators expressly preempts local franchising authority over OVS operators, as § 601(c)(1) and *Gregory* require.

We cannot agree with the Commission's unsupported assertion that local franchising authority arises from § 621. While the agency cites no support for its position, there are persuasive

---

[4] Instead of citing authority for the proposition that franchising authority rests solely on § 621, the Commission merely argues that the Cities must recognize that the source of their franchising authority lies in § 621, for "[i]n 1994, when a number of local authorities . . . challenged the FCC's determination that the franchise requirement of § 621 did not apply to video dialtone, not a single city argued that it had independent authority to require a video dialtone franchise regardless of whether § 621 applied." There may have been a number of reasons for various cities' decision, and we will not attempt to discern a rule of law from unaffiliated parties' litigation strategies in another case.

13

*dicta* supporting the contrary view that § 621 merely codified and restricted local governments' independently-existing authority to impose franchise requirements.[5]

Moreover, the legislative history of the 1984 Cable Act contradicts the Commission's claim that that Act established § 621 as the sole source of franchising authority. According to the House Report on H.R. 4103, whose terms were later incorporated into S. 66 to become the 1984 Cable Act,

> Primarily, cable television has been regulated at the local government level through the franchise pro-cess. . . . H.R. 4103 establishes a national policy that clarifies the current system of local, state, and Federal regulation of cable television. This policy continues reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process.

H.R. Rep. No. 98-934, at 19 (1984). These sources suggest that franchising authority does not depend on or grow out of § 621. While § 621 may have expressly *recognized* the power of localities to impose franchise requirements, it did not *create* that power, and elimination of § 621 for OVS operators does not eliminate local franchising authority.

The Commission could come to a contrary conclusion only by

---

[5] *See National Cable Television Ass'n v. FCC*, 33 F.3d 66, 69 (D.C. Cir. 1994) (noting that one of the purposes of the 1984 Cable act was to "preserve[] the local franchising system"); *Time Warner Entertainment Co., L.P. v. FCC*, 93 F.3d 957, 972 (D.C. Cir. 1996) ("[P]rior to the passage of the 1984 Cable Act, and thus, in the absence of federal permission, many franchise agreements provided for [public, educational and governmental access] channels. . . . Congress thus merely recognized and endorsed the preexisting practice . . . .").

14

reading its preemptive authority broadly. But § 601(c) precludes a broad reading of preemptive authority, as does *Gregory*, 501 U.S. at 460 (opining that courts must "assume Congress does not exercise [the power to preempt] lightly" and must require Congress to state clearly its intent to preempt). *Chevron* deference is not appropriate here, for Congress, in § 601(c), already has resolved the issue of preemption of local franchising authority.

The FCC also argues that to achieve Congress's deregulatory objectives, it is necessary to interpret the statute to preempt local franchising authority to achieve Congress's deregulatory objectives. The provisions of title VI that "shall not apply" to OVS operators do not merely require cable operators to obtain a franchise from a local authority; they also place limits on the conditions and restrictions a local franchising authority may impose. *See*, *e.g.*, 47 U.S.C. § 541(a)(2). The Commission maintains that if § 653(c)(1)(C) does not preempt local franchising authority altogether, but instead simply directs that local authorities will no longer be constrained to regulate OVS operators as provided in Title VI, localities will be able to impose more onerous regulations on OVS operators than on cable operators. This result would conflict with Congress's express desire to reduce the regulatory burdens OVS operators face relative to their cable

15

operator counterparts.[6]

While the agency's argument is plausible, it does not affect our holding.  The statutory text, read in the light of *Gregory*'s and § 601(c)(1)'s warnings against implied preemption, does not support the Commission's interpretation, and apparent congressional intent as revealed in a conference report does not trump a pellucid statutory directive.

B.  Limitation of Localities' Compensation Under § 653(c)(2)(B) to a Percentage of the Gross Revenues of the OVS Operator.

Section 653(c)(2)(B) provides for local franchising authorities to collect fees from OVS operators "in lieu of" franchise fees:

> An operator of an open video system under this part may be subject to the payment of fees on the gross revenues of the operator for the provision of cable service imposed by a local franchising authority or other governmental entity, in lieu of the franchise fees permitted under section 542 of this title.  The rate at which such fees are imposed shall not exceed the rate at which franchise fees are imposed on any cable operator transmitting video programming in the franchise area . . . .

47 U.S.C. § 573(c)(2)(B).  In the orders on review, the Commission concludes that the fees assessed on OVS operators under this

---

[6] Congress plainly wanted to lower the regulatory hurdles OVS operators face.  The Conference Report explained that Congress was "streamlining the regulatory burdens of [open video] systems" for a number of reasons, including the need to promote competition and encourage new entrants in the market for video programming delivery.  *See* H. Conf. Rep. No. 104-458 (hereinafter "*Conference Report*") at 178.  In addition, the heading that Congress adopted as part of § 653(c)§§"REDUCED REGULATORY BURDENS FOR OPEN VIDEO SYSTEMS"§§underscores its purpose to subject OVS's to decreased regulation.  *See* 47 U.S.C. § 573(c).

provision will be based solely on the gross revenues of the operators, "not includ[ing] revenues collected by unaffiliated video programming providers from their subscribers or advertisers." *Rulemaking Order* ¶ 220. In other words, localities can charge OVS operators a percentage of the operators' revenue but not a percentage of their unaffiliated programmers' revenue.

The Cities argue that the Commission erred in calculating the fees chargeable to OVS operators. They assert that (1) the statute does not preclude a franchise authority from levying charges on persons, unaffiliated with the OVS operator, who provide video programming on the OVS; and (2) the statute does not say that the franchise authority may not impose additional charges on OVS operators beyond the "in lieu of" fees authorized by § 653(c)(2)(B). Limiting an OVS operator's fees to a percentage of its gross revenue would result in OVS operators' paying less than cable operators, who do not have extensive obligations to make their channels available to unaffiliated programmers and thus collect for themselves most of the revenue generated by their cable systems. This result, the Cities contend, is contrary to Congress's desire, expressed in the legislative history, to maintain "parity" between cable operators and OVS operators.[7]

We affirm the rule limiting the fees collectible under § 653(c)(2)(B) to a percentage of the OVS operator's gross revenue.

---

[7] *See Conference Report* at 178 (describing the fee-in-lieu provisions as "another effort to ensure parity among video providers").

The plain language, which merely authorizes "fees on the gross revenues of the operator," forecloses the argument that fees charged under § 653(c)(2)(B) may be based on the revenues of unaffiliated video providers.

The reference in the legislative history to "parity" between cable operators and their OVS counterparts is not dispositive. The parity to which Congress referred in the Conference Report is a parity of *rates*, not actual *fees*: The statute provides that "[t]he rate at which such fees are imposed shall not exceed the rate at which franchise fees are imposed on any cable operator transmitting video programming in the franchise area . . . ." 47 U.S.C. § 653(c)(2)(B). Hence, the narrow rule in the agency orderSSthat the fee-in-lieu assessed on OVS operators must be based solely on the gross revenues of the operator and its programming affiliatesSSis wholly consistent with the statute.

Because the Commission neither considered nor resolved the issues of whether local governments could also require unaffiliated programmers to pay fees on their OVS revenues and whether localities could levy fees on OVS operators in addition to the fees-in-lieu, the Cities' arguments on these points are premature. The sections of the FCC orders dealing with compensationSSthe only compensation rules under review hereSSmerely provide that fees *charged to an OVS operator under § 653(c)(2)(B)* may not be based on unaffiliated programmers' revenues. *See Rulemaking Order* ¶ 220;

18

*Reconsideration Order* ¶¶ 115-22.  The Cities argue that "the statutory provision does not prohibit the receipt of other compensation from the OVS operator, or limit fees that may be imposed upon persons who use the OVS system to provide service to subscribers."  But the FCC did not state otherwise in the orders at issue, and the Cities did not raise these arguments in the rulemaking proceedings.  Accordingly, we decline to address these claims.[8]

## C.  The Commission's Failure To Authorize Local Governments To Require OVS Operators To Provide Institutional Networks.

The Commission's rules require an OVS operator to provide capacity on an institutional network[9] only if the operator has voluntarily elected to build such a network.  *See* 47 C.F.R. § 76.1505(e) (1997).  If the OVS operator has not elected to build an institutional network, the rules do not give local governments authority to require construction of such a network.  *Id.*  NATOA contends that the agency acted contrary to the statute in failing to authorize local governments to demand that OVS operators provide institutional networks.  This argument rests on a misreading of the statute.

---

[8] *See Time Warner Entertainment Co., L.P. v. FCC*, 56 F.3d 151, 201 (D.C. Cir. 1995) (precluding party from raising issue on appeal because it "did not raise the issue before the Commission in the first instance").

[9] An institutional network is "a communication network which is constructed or operated by the cable operator and which is generally available only to subscribers who are not residential subscribers."  47 U.S.C. § 531(f).

NATOA's four-step statutory argument proceeds as follows: (1) Section 653(c)(1)(B) states that § 611 shall apply to OVS operators. 47 U.S.C. § 573(c)(1)(B). (2) Section 653(c)(2) then provides that the obligations on OVS operators under § 611 shall be "no greater or lesser" than they are for cable operators. 47 U.S.C. § 573(c)(2). (3) Section 611 permits localities to require cable operators to provide institutional networks. 47 U.S.C. § 531(b). (4) Hence, § 611, which applies jot-for-jot to OVS operators, must permit localities to require OVS operators to provide institutional networks. The problem with this argument lies in step three: Contrary to NATOA's assertion, § 611 does not permit localities to require cable operators to build institutional networks but instead, by its terms, merely states that "[a] franchising authority may . . . require . . . that . . . channel capacity on institutional networks be designated for educational or governmental use . . . ." 47 U.S.C. § 531(b). In other words, localities may require that cable operators devote space on their existing institutional networks, if there are any such networks, to educational or governmental use, but the statute does not authorize local governments to *require* the construction of institutional networks.

Section 621(b)(3)(D) also indicates that NATOA is in error in reading § 611 as empowering localities to require such construction. That section states:

> Except as otherwise permitted by sections 611 and 612 of this title, a franchising authority may not require a cable operator to provide any telecommunications service or facilities, *other than institutional networks*, as a condition of the initial grant of a franchise, a franchise renewal, or a transfer of a franchise.

47 U.S.C. § 541(b)(3)(D) (emphasis added). If § 611 authorized localities to require provision of institutional networks, the words "other than institutional networks" would be surplusage. Thus, the plain language of § 611(b), buttressed by the implicit interpretation § 621(b)(3)(D) provides, supports the Commission's conclusion that § 611(b) does not authorize local governments to require the construction of institutional networks.[10]

D. Permitting Entities Other than LEC's To Become OVS Operators.

The first two sentences of § 653(a)(1) of the Act state:

> A local exchange carrier may provide cable service to its cable service subscribers in its telephone service area through an open video system that complies with this section. To the extent permitted by such regulations as the Commission may prescribe consistent with the public

---

[10] The FCC and Intervenors RCN and Bell Atlantic argue that § 621(b)-(3)(D)SSnot § 611(b)SSis the source of local franchising authorities' power to order cable operators to provide institutional networks. NATOA responds convincingly by noting that the 1996 Act added § 621(b)(3)(D) and that the obligation to provide institutional networks pre-dated the 1996 Act. Obviously, then, the obligation could not stem from § 621(b)(3)(D).

This observation, however, does not disturb the conclusion that § 611(b) does not authorize localities to order provision of institutional networks. That conclusion follows from (1) the fact that the plain language of § 611(b) does not give localities authority to order institutional networks, and (2) Congress's implied assertion, in § 621(b)(3)(D), that § 611(b) does not grant such authority. We do not have to decide that § 621(b)(3)(D) is the source of localities' authority to order institutional networks to conclude that § 611(b) is not the source of such authority. NATOA has cited no case or agency decision interpreting § 611(b) to permit localities to order institutional networks, and the plain language of § 611 does not provide such authority.

21

> interest, convenience, and necessity, an operator of a cable system or any other person may provide video programming through an open video system that complies with this section.

47 U.S.C. § 573(a)(1). The orders under review permit non-LEC cable operators who face "effective competition" to provide cable service as OVS operators.

NATOA argues that the FCC erred in allowing non-LEC's to provide OVS service, for Congress expressly permitted only LEC's to do so. NATOA points out that the first sentence of § 653(a)(1) says LEC's may provide "cable service" through an OVS, and the second sentence merely gives the FCC authority to permit cable operators to provide "video programming." *See* 47 U.S.C. § 573(a)(1). NATOA notes that not only do these terms have different common meaningsSScable service refers to the physical connections, while video programming means television showsSSbut they are also defined differently in the statute.

Section 602(6) defines "cable service" as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6). Section 602(20) states that "the term 'video programming' means programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(20). NATOA insists that the fact that Congress used two different terms

22

that it had defined differently elsewhere in the statute means that it intended the two sentences of § 653(a)(1) to authorize two distinct services:  LEC's may provide cable service; cable operators may only provide television shows on others' OVS systems.

The fact that the first sentence of § 653(a)(1) expressly authorizes LEC's to provide OVS service, however, does not bar the FCC from permitting other entities to provide it, for the FCC has ancillary authority under § 4(i) of the Communications Act to permit non-LEC's to be certified as OVS operators.  Section 4(i) gives the Commission authority to "perform any and all such acts, make such rules and regulations, and issue such orders, not inconsistent with [the Act], as may be necessary in the execution of its functions."  47 U.S.C. § 154(i).  Even before Congress expressly authorized *any* federal regulation of cable television, both the Supreme Court and this court had acknowledged the Commission's ancillary authority to regulate cable service under § 4(I).  *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 171-78 (1968); *General Tel. Co. v. FCC*, 449 F.2d 846, 853-54 (5th Cir. 1971).  If the FCC had ancillary authority to adopt an entire regulatory regime for cable television, it surely has ancillary authority to extend to non-LEC's the permission to operate OVS's.

NATOA contends that § 4(i) does not apply, because the FCC's actions are inconsistent with the Act.  NATOA fails, however, to point out the inconsistency.  Citing no statutory provision that

23

supports its view, it states that "Congress never intended to allow non-LEC's to be OVS operators."

The language in § 653(a)(1) is not inconsistent with the agency's interpretation. Sentence one says LEC's may provide cable service, and sentence two merely states that cable operators may provide video programming according to rules the FCC prescribes. Permitting cable operators also to provide cable service according to rules the Commission prescribes is in no way inconsistent with the language of either of these sentences. Hence, the Commission did not exceed its authority in adopting regulations permitting non-LEC's to be certified as OVS operators.

## V.  The Cable Companies' Claims.

In its orders, the Commission generally takes the position that a cable operator may provide neither OVS service nor video programming on an unaffiliated, in-region OVS unless the cable operator faces "effective competition."[11]  This effective-competition requirement applies to LEC's that are also cable operators, *see Rulemaking Order* ¶ 25, as well as to cable operators whose cable franchises have terminated, see *Reconsideration Order* ¶ 27. The rules regarding carriage of video programming do, however, allow OVS operators to ignore the general ban on in-region cable

---

[11] *See Rulemaking Order* ¶¶ 23, 25, 26 (stating that cable operator may not provide OVS service in its cable service area in absence of effective competition)*; Reconsideration Order* ¶ 51 (stating that cable operator generally may not obtain programming capacity on an unaffiliated in-region OVS).

operators' providing programming on unaffiliated OVS's. An OVS operator has discretion to determine whether it will carry an in-region cable operator's programming. *See Reconsideration Order* ¶ 52.

The NCTA challenges these rules on several grounds. First, it argues that the Commission exceeded its statutory authority in prohibiting LEC's that are also cable operators from being eligible to be OVS operators in the absence of effective competition. Next, it avers that it is arbitrary and capricious for the FCC to impose an effective competition requirement on cable operators that seek to provide OVS service in their cable service areas. Third, it contends that even if it is reasonable for the agency to impose the effective-competition requirement on current cable operators, it is arbitrary and capricious for it to impose the requirement on cable operators whose cable franchises have terminated. Finally, NCTA urges that the Commission's rules generally prohibiting cable operators from providing video programming on in-region OVS's, but giving the OVS operators the discretion to grant access to cable operators, violate provisions of the Act prohibiting discrimination by OVS operators.

### A. The Effective-Competition Requirement for LEC's That Are Also Cable Operators.

The Commission contends that its rule prohibiting cable operators who are also LEC's from providing OVS service in the

absence of effective competition represents a reasonable interpretation of ambiguous statutory language and thus deserves *Chevron* deference. Because we believe the Commission has ignored plain text and has attempted to manufacture an ambiguity in order to obtain an increased level of judicial deference, we invalidate the rule imposing an effective competition requirement on LEC's who are also cable operators.

The Commission argues that the first two sentences of § 653(a)(1) leave an ambiguous "gap." The first sentence states, "A local exchange carrier may provide cable service to its cable service subscribers in its telephone area through an open video system that complies with this section." 47 U.S.C. § 573(a)(1). The meaning of that language is evident: LEC's in compliance with § 653 may provide OVS service.

The second sentence then provides, "To the extent permitted by such regulations as the Commission may prescribe consistent with the public interest, convenience, and necessity, an operator of a cable system or any other person may provide video programming through an open video system that complies with this section." *Id.* Again, the language appears untroubling: Cable operators and others may provide video programming, which the FCC has defined to include OVS service, to the extent the agency determines that their doing so is in the public interest.

The Commission insists that ambiguity results from the

26

conjunction of these two sentences. Sentence one deals with LEC's, sentence two with cable operators; the statute is silent as to LEC's who are also cable operators. Hence, the statute is ambiguous, the Commission asserts, and in the face of such congressional silence or ambiguity, we should defer to the agency's reasonable interpretation that "hybrid" LEC/cable operators should be governed by sentence two and thus are subject to the FCC's public interest standards.

We do not accept the Commission's claim that the statute is ambiguous as to "hybrid" LEC/cable operators. The language of sentence one is straightforward: "A local exchange carrier *may provide cable service* to its cable service subscribers in its telephone area through an open video system that complies with this section." 47 U.S.C. § 653(a)(1) (emphasis added). The FCC recognized the unequivocal nature of this provision when it stated, "[T]he first sentence of Section 653(a)(1) allows LECs, *without qualification,* to operate open video systems within their telephone service areas . . . ." *Rulemaking Order* ¶ 25.

The Commission's assertion that Congress was silent as to "hybrid" LEC's and that the Commission thus may treat them not as LEC's under sentence one, but as cable operators under sentence two, is not convincing. The agency claims that Congress was silent on how to treat hybrid LEC's because it just never thought about such entities. The Commission explains, "In light of the cross-

27

ownership ban, it is hardly surprising that Congress failed specifically to address the conditions under which the hybrid company described by NCTA could operate an open video system, because no such company existed." But such companies did exist, and Congress did know about them.

While a general telephone company-cable cross-ownership ban existed prior to the Act, for years telephone companies have been able to apply for permission to provide cable service in their telephone service areas pursuant to waivers or the liberal rural telephone company exemption provided in the statute. *See* 47 U.S.C. § 533(b)(3), *repealed by* § 302(b)(1) of the 1996 Act. In 1984, Congress codified the Commission's previously existing cable-telephone company cross-ownership ban but eliminated the require-ment that rural LEC's apply for exemption from the ban. It did so out of concern that the FCC had been interpreting the cross-ownership ban in such a way as "unnecessarily [to] prevent[] some rural telephone companies from offering cable television service in rural areas."[12] Apparently, then, although Congress was well aware that there are LEC's that are also cable operators,[13] it nonetheless

---

[12] H.R. Rep. No. 98-934, at 56-57 (1984) ("It is the intent of Section 613(b) to codify current FCC rules concerning the provision of video programming over cable systems by common carriers, except to the extent of making the exemption for rural telephone companies automatic.").

[13] Moreover, two of the primary goals of the Act were to facilitate cable companies' becoming LEC's and to permit LEC's to become cable companies. *See Conference Report* at 148 (noting that "meaningful facilities-based [local telephone] competition is possible given that cable services are available to
(continued...)

stated "without qualification" that LEC's may provide OVS service.

Congress also knew how to distinguish among respective groups of LEC's, and the fact that it did not single out cable operator-LEC's for different treatment under sentence one of § 653(a)(1) indicates that it intended all LEC's to be treated the same. When Congress wanted to distinguish traditional, "incumbent" LEC's from the new "competitive" LEC's (including cable companies) whose entry the Act facilitated, it did so in plain terms.

For instance, Congress established different interconnection obligations for incumbent LEC's versus all LEC's. *Compare* 47 U.S.C. § 251(b) (obligations of all LEC's) *with* § 251(c) (additional obligations of incumbent LEC's). The absence of distinction among LEC's in sentence one indicates that Congress intended the provision to cover all LEC's.

Finally, we reject the agency's reading of § 653(a)(1), because it nullifies the first sentence of the provision. The second sentence permits the Commission to apply its public interest criteriaSSthe statutory basis for its effective-competition requirementSSto "any other person" as well as to cable operators. *See* 47 U.S.C. § 573(a)(1). If sentence one is subject to sentence two, as the Commission's reading suggests, then *every* LEC is

---

[13](...continued)
more than 95 percent of United States homes" and that "[s]ome of the initial forays of cable companies into the field of local telephony therefore hold the promise of providing the sort of local residential competition that has consistently been contemplated"); 47 U.S.C. § 571(a)(3) (§ 651(a)(3) of the Act) (permitting LEC's to provide cable service).

covered by the second sentence and may provide video programming only at the Commission's discretion.

Under this reading, however, the first sentence is a nullity, because the FCC may always decide, on the basis of the public interest, convenience, and necessity, which persons may provide video programming. The only way to avoid nullifying the first sentence is to recognize that the sentence carves out a groupSSLEC'sSSwhose right to provide video programming is not subject to the agency's public interest standard.

## B. The Effective Competition Requirement for Cable Operators Who Seek To Provide OVS Service.

NCTA challenges the rule that cable operators may not operate OVS's in their cable service areas unless they face effective competition, but it does not claim that the plain language of § 653 forecloses the effective-competition requirement. Instead, NCTA argues that the Commission has exercised its authority in an arbitrary and capricious manner in adopting the effective-competition requirement under § 653(a)(1)'s public interest standard.[14] In particular, NCTA argues that the effective-competition requirement is unnecessary because OVS creates its own competition.[15]

---

[14] *See* 5 U.S.C. § 706(2) (requiring reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of agency discretion, or otherwise not in accordance with law").

[15] OVS's create their own competition because each OVS operator must
(continued...)

30

Because of the deference accorded agency judgments regarding the public interest, and because the agency considered appropriate arguments and reasonably adopted its conclusion, we affirm the general effective competition requirement.

Judicial deference to agency judgments is near its zenith where issues of the public interest are involved.  In *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1980), the Court explained that its opinions had "repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference."  Accordingly, the Court held that

> [t]he Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals, for the weighing of policies under the public interest standard is a task that Congress has delegated to the Commission in the first instance.

Id.[16]  Given these precedents, we affirm the Commission's policy choice if it considered competing arguments and articulated a reasonable basis for its conclusion.  It did both.

NCTA presented to the FCC its argument that an effective-competition requirement is unnecessary because an OVS creates its

---

[15](...continued)
surrender two-thirds of the system's carrying capacity to unaffiliated programmers, as long as there is demand for carriage.  47 U.S.C. § 573(b)(1)(B).

[16] *See also American Transfer & Storage Co. v. Interstate Commerce Comm'n*, 719 F.2d 1283, 1300 (5th Cir. 1983) (deferring to ICC's view of how to promote public interest); *Missouri-Kansas-Texas R.R. v. United States*, 632 F.2d 392, 399–400 (5th Cir. 1980).

own competition, *see Reconsideration Order* ¶ 21, but the Commission reasonably rejected that argument. The agency concluded, "There is no assurance that any particular system will generate sufficient competition between providers of 'comparable' video programming services to qualify as a meaningful stand-in for effective facilities-based competition." *Id.* at ¶ 26. This, we believe, represents a fair weighing of policies and a reasonably-based conclusion.

The Commission did provide a plausible basis for its effective-competition requirement. In essence, it determined, on the basis of the text and legislative history of the Act, that Congress wanted to exempt OVS operators from much title VI regulation because they would be competing with incumbent cable subscribers. If an entity is not facing competition, it should not get the regulatory "break" the OVS provisions provide, especially as its greater market power likely merits increased regulation. Hence, the effective-competition requirement works to ensure that the regulatory relief in § 653 is properly targeted at new entrants. *See Reconsideration Order* ¶ 25.[17]

---

[17] That part of the order states:

We believe that Congress exempted open video system operators from much of Title VI regulation because, in the vast majority of cases, they will be competing with incumbent cable operators for subscribers. Our effective competition restriction implements Congress' intent by ensuring that, where it is the incumbent cable operator itself that seeks to enter the marketplace as an open video system operator, there is at least one other multichannel video programming provider competing in the market (or, if the cable operator enters

(continued...)

Given this reasonable argument and the substantial deference courts should afford agencies implementing public interest standards, *see WNCN Listeners Guild*, 450 U.S. at 596, we uphold the effective competition rule.[18]  While we might have weighed the competing policies differently, we cannot say that the balance the Commission struck is irrational.

### C.   Extending the Effective Competition Requirement to Cable Operators Whose Cable Franchises Have Terminated.

NCTA advances two arguments in support of its claim that the Commission acted arbitrarily and capriciously in adopting a rule precluding cable operators who do not face effective competition

---

[17](...continued)
under the "low penetration" test for effective competition, that it does not possess a level of market power that Congress believed requires regulation).

*Reconsideration Order* ¶ 25.

[18] NCTA makes two other arguments that are worth addressing.  It asserts that if Congress had been as focused on fostering competition as the Commission suggests, it would have forbidden OVS operators to start up service in areas where they would be the sole video programming providers.  There are two responses to this argument.  First, because 96% of homes have cable access, it was reasonable for Congress not to spend time legislating over the few instances in which an OVS operator who starts up will not face competition.  *See Reconsideration Order* ¶ 26.  Second, while competition is ideal and should be pursued to the extent possible, it is certainly in the public interest for OVS operators to enter markets where there is no video programming.  While they would have a monopoly, at least some form of cable service would be available at some price.

NCTA also argues that the fact that the FCC exempts cable operators from the effective competition rule when entry by a competitor is infeasible, *see Rulemaking Order* ¶ 24, indicates that the effective-competition rule is irrational.  Again, the fact that the Commission permits OVS service to exist by itself in a few areas where competition simply could not occur does not mean that it is irrational (or "arbitrary and capricious") to require effective competition when such competition *is* feasible.

33

from providing OVS service even after their cable franchises have terminated. Although couched as a claim that the Commission made an arbitrary and capricious policy choice, the first argument NCTA makes is really a statutory claim. It contends that, as a matter of law, once a cable operator's franchise has been terminated, it is no longer a "cable operator" under the Act and therefore should be subject to the same OVS requirements as "any other person."[19] In other words, the rule requiring effective competition for cable operators does not apply to *ex*-cable operators.

While NCTA may be correct from a purely formalistic perspective, we do not find this argument convincing. Under the second sentence of § 653(a)(1), the FCC could always regulate video programming by former cable operators by using its power to set the terms under which "any other person" may provide such programming. For example, it could adopt a rule stating, "Any other person who seeks to provide OVS service must face effective competition if he used to be a franchised cable operator." Such a rule would be identical in substance to the rule the agency has adopted, and we decline to require such extreme formalism.

NCTA's second argument does attack the soundness of the FCC's policy choice. NCTA contends that a cable operator loses its market power when it gives up its franchise, and it therefore

---

[19] *See* 47 U.S.C. § 573(a)(1) (stating that "an operator of a cable system or any other person may provide video programming" according to the rules the Commission promulgates in the public interest).

should not be subject to the effective-competition requirement. Because a cable operator may not provide cable service without a franchise, *see* 47 U.S.C. § 541(b)(1), a disenfranchised cable operator is impotent; it cannot provide any video programming, much less dominate the local market. Moreover, even if the company is certified as an OVS operator, it loses much of its market power because it must surrender up to two-thirds of its programming capacity. *See* 47 U.S.C. § 573(b)(1)(B). Hence, NCTA argues, the Commission's decision to impose the effective-competition requirement on cable operators who have lost their franchises is arbitrary and capricious.

The Commission offers a plausible response. It contends that a cable company does not lose its market power upon losing its franchise, for "[a] cable operator's market power arises from, among other things, the ownership of its transmission network, its customer base, and its carriage agreements with various programmers[,] . . . factors [that] would survive the termination of an operator's cable franchise and would put any would-be competitor at a substantial disadvantage." Moreover, the Commission argues, if a cable company could avoid the effective-competition rule by giving up its franchise, it could just let the franchise expire, then offer OVS service over its existing network. By so doing, it

35

could maintain its monopoly position[20] *and* get the regulatory relief available to OVS operators, who are expected to be new entrants. Given this rational basis for the FCC's policy determination and the deference owed its public interest decisions, we affirm the rule precluding cable operators who do not face effective competition from providing OVS service even after their cable franchises terminate.

### D. Prohibiting In-region Cable Operators from Obtaining Capacity on an OVS, While Permitting OVS Operators To Waive This General Prohibition.

Claiming authority under sentence two of § 653(a)(1), 47 U.S.C. § 573(a)(1), the FCC generally banned cable operators from providing video programming on unaffiliated OVS systems within their cable service areas.[21] The Commission also ruled, however, that "a competing, in-region cable operator may access an open video system when the open video system operator determines that it is in its interests to grant access."[22] In other words, an OVS operator has discretion to determine whether it will carry a cable

---

[20] Of course, if the cable company gave up its cable franchise, the locality likely would accept bids for a new cable operator. But whatever entity began cable operations would have to construct or acquire a networkSSa costly and time-consuming venture. The former cable operator probably would maintain a monopoly position *and* get the benefits of regulatory relief, for some time.

[21] *See Reconsideration Order* ¶ 51 (providing that "pursuant to the second sentence of Section 653(a)(1), the public interest, convenience and necessity is served by generally prohibiting a competing, in-region cable operator from obtaining capacity on an open video system").

[22] *Id.* ¶ 52.

operator's video programming.  Because this regulation is contrary to the plain language of § 653(b)(1)(A), which requires the Commission to "prohibit an operator of an open video system from discriminating among video programming providers with regard to carriage on its open video system," 47 U.S.C. § 573(b)(1)(A), we invalidate these rules and remand for further consideration.  On remand, the agency must forbid discrimination among video programming providers, as § 653(b)(1)(A) requires.

The agency contends that its two rules (the "general prohibition" and the "discretion to waive the general prohibition") are authorized by the second sentence of § 653(a)(1), which provides that a cable operator "may provide video programming through an open video system" only "[t]o the extent permitted by such regulations as the Commission may prescribe consistent with the public interest, convenience, and necessity."  47 U.S.C. § 573-(a)(1).  The general prohibition is authorized because the Commission has determined that the public interest would best be served by generally banning carriage of a cable operator's programming on an OVS.  This is so because "a competing, in-region cable operator should be encouraged to develop and upgrade its own system, rather than to occupy capacity on a competitor's system that could be used by another video programming provider." *Rulemaking Order* ¶ 52.

This rule, the Commission argues, does not conflict with

§ 653(b)(1)(A)SSthe provision requiring it to enact regulations to prohibit discrimination by OVS operators against and among video programmersSSbecause "[b]y definition, an OVS operator does not discriminate by denying carriage to one who, pursuant to the Commission's rules, is not eligible 'to provide video programming through an open video system.'" In other words, the Commission has adopted a blanket rule that in-region cable operators are not eligible to provide programming, and denying carriage of ineligible cable operators' programming therefore is not discrimination against a video programming provider.

This "eligibility" argument does not work as long as OVS operators are permitted to ignore the ban and carry cable operators' video programming. If OVS operators may disregard the general prohibition, then the FCC has not really declared cable operators ineligible.

If the Commission is declaring cable operators ineligible to the extent OVS operators *want* them to be ineligible, then it is permitting discrimination by OVS operators among video programming providers. Section 653(b)(1)(A) requires the agency not to do that. Alternatively, the Commission is impermissibly delegating to the OVS operators its authority to determine "the extent" to which cable operator carriage promotes the public interest.[23]

---

[23] *See Carter v. Carter Coal Co.*, 298 U.S. 238, 310-11 (1936); *Sierra Club v. Sigler*, 695 F.2d 957, 963 n. 3 (5th Cir. 1983) (holding that "an agency may not delegate its public duties to private entities"); *National Ass'n of*
(continued...)

38

The FCC argues that there is no impermissible delegation here, as there was in the cases cited, because those cases involved delegation where a private party had been given regulatory power that could be exercised to the detriment of other regulated entities or for the improper benefit of the entity receiving the delegation. Here, by contrast, the OVS operator is merely given power to invoke an exception and thereby benefit, at its discretion, another regulated entity. The rule has the same effect as would a private party's decision not to seek enforcement of some administrative restriction against a regulated entity.

This argument elevates form over substance. Regardless of whether the rule is that OVS operators may choose to disregard a default rule *granting* cable operators carriage rights, or is that they may elect to disregard one *denying* such rights, the fact remains that they are being permitted to choose whether they want to give cable operators access rights. This is a delegation of regulatory authority to impose a cost on another regulated entity and, hence, violates general principles of administrative law as well as the particular anti-discrimination provisions of § 653(b). The FCC's formalistic wrangling amounts to a distinction without a difference, and the genesis of the rule reveals as much: Not until the cable operators complained about illegal discrimination did the

---

[23](...continued)
*Regulatory Utility Comm'rs v. FCC*, 737 F.2d 1095, 1143-44 (D.C. Cir. 1984).

Commission switch from a rule allowing OVS operators to ban in-region cable operators' video programming to one permitting OVS operators to exempt such programming from a general ban. *Compare Rulemaking Order* ¶ 54 with *Reconsideration Order* ¶ 52. Thus, we invalidate the rule permitting OVS operators selectively to lift the general ban on cable operators providing video programming on OVS systems.

## VI. BellSouth's Claim.

The FCC adopted a new construction notification rule requiring a carrier to obtain FCC approval of its certification before constructing new physical plants needed to operate OVS systems. *See Rulemaking Order* ¶ 34. A carrier may not request certification, however, until it can make detailed verifications concerning the proposed OVS, including details about ownership, the communities to be served, the analog and digital capacities of the system, and the number of channel ports.[24] BellSouth claims this rule is contrary to the statutory language and is arbitrary and capricious. We agree that the rule violates the statute but do not reach BellSouth's claim that the policy choices are arbitrary and capricious.

Two convincing statutory arguments support the view that the

---

[24] *See Rulemaking Order* Appendix C, Instructions for FCC Form 1275 Open Video System Certification of Compliance.

40

Commission erred in adopting the new construction rule.  The first relies on the mandatory language of § 653(a)(1), the third sentence of which states, "An operator of an open video system *shall qualify* for reduced regulatory burdens under subsection (c) of this section if the operator of such system certifies to the Commission that such carrier complies with the Commission's regulations *under subsection (b) of this section* and the Commission approves such certification."  47 U.S.C. § 573(a)(1) (emphasis added).  Any new construction rule the Commission promulgates is not a "regulation[] under subsection (b)," so, consistently with the statute, failure to follow the rule could not prevent an operator from qualifying for reduced regulatory burdens under subsection (c).

The second argument rests on two provisions in the statute in which Congress expressly exempted common carriers who operate OVS's from the pre-construction notice requirement normally applicable to common carriers.  First, § 651(c) states that "[a] common carrier shall not be required to obtain a certificate under section 214 of this title with respect to the establishment or operation of a system for the delivery of video programming."  47 U.S.C. § 571(c).  It thus exempts common carriers providing video service from the § 214 rule that

> [n]o carrier shall undertake the construction of a new line or of an extension of any line . . . unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction . . . of such additional or extended

41

line . . . .

47 U.S.C. § 214(a).

Second, § 653(c)(3) states that "with respect to the establishment and operation of open video systems, the requirements of [§ 653] shall apply in lieu of, and not in addition to, the requirements of title II."  47 U.S.C. § 573.  Title II includes the § 214 pre-construction notice requirement.  These two provisionsSS§ 651(c) and § 653(c)(3)SSthus affirmatively prohibit the Commission from adopting a pre-construction notice requirement for OVS operators.

The FCC maintains that the certification it requires for OVS operators is not nearly as complex or detailed as that required by § 214, so the pre-construction notice is not "precisely the same requirement" as that imposed on common carriers under § 214.  The Commission then argues that, while the criticisms set forth above assume that the agency may not adopt a regulation not specifically prescribed in the Act, *expressio unius* "'has little force in the administrative setting,' where [courts] defer to an agency's interpretation of a statute unless Congress has 'directly spoken to the precise question at issue.'"  *Mobile Communications Corp.*, 77 F.3d at 1405 (*quoting Texas Rural Legal Aid*, 940 F.2d at 694).

Both of the Commission's arguments are inadequate.  The *expressio unius* argument fails because the reasoning does not rely on the *expressio unius* canon.  The Act plainly says a cable

provider "shall qualify" for regulatory relief as an OVS operator if it complies with the FCC's "regulations under subsection (b)." 47 U.S.C. § 573(a)(1). The regulations required by subsection (b) are narrowly tailored and relate to carriage obligations. The new construction notification requirement is not a subsection (b) regulation, and, consistently with the mandatory terms of the statute, failure to comply with the requirement may not preclude a cable service provider from qualifying for regulatory relief under subsection (c).

Nor do we accept the agency's argument that its new construction rule is less onerous than is the § 214 requirement and therefore should not be barred by the provisions exempting, from § 214, common carriers who provide video service from § 214. The plain language of § 214 says "[n]o carrier shall undertake construction . . . unless and until there shall have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction . . . ." 47 U.S.C. § 214. Sections 651(c) and 653(c)(3) state that this rule shall not apply to common carriers providing an OVS. The Commission should not be able to deny the regulatory relief these sections provide merely by pointing out that there are some differences between its new pre-construction certification rule and the old one it is expressly forbidden to impose.

Moreover, the legislative history supports the view that

Congress meant to preclude *all* pre-construction notification rules for OVS operators. The Conference Report states that Congress was prohibiting the Commission from "impos[ing] title II-like regulation" on OVS operators, *see Conference Report* at 178, and explains that "common carries [sic] are not required to obtain certificates under section 214 in order to construct facilities to provide video programming services," *see id.* at 175 (summarizing Senate version). Even if it is less burdensome than the certification required under § 214, the new construction rule is a title II-like regulation that directly contravenes the text and legislative history of §§ 651 and 653. Accordingly, we invalidate the rule.[25]

Finally, we note that the Commission's rationale for requiring pre-construction certification likely disappears in the wake of this opinion. The Commission ordered pre-construction certification because of the need to let local authorities know which entities had been granted enforceable rights to use local rights-of-way. *See Rulemaking Order* ¶ 34. While the need to provide such information may have been a genuine concern if the OVS provisions had preempted local franchising authority, we say in this opinion that localities retain franchising authority over OVS operators. Hence, the rationale for the pre-construction certification rule no

---

[25] *See Presley v. Etowah County Comm'n*, 502 U.S. 491, 508-09 (1992) (agency entitled to *Chevron* deference "only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable").

longer exists.[26]

VII.  Conclusion.

The petitions for review are GRANTED, so we may interpret the subject rules in such a way as to be consistent with the text of the Act and the principles of agency deference articulated in *Chevron*, resulting in a regulatory regime for OVS's that preserves local authority and permits widespread entry into this video programming medium.  In summary, on the issues raised by the Cities, we reverse, on statutory grounds, the Commission's preemption of local franchising authority.  We affirm the rules permitting non-LEC's to become OVS operators, the Commission's formula for determining the "fee in lieu of" a franchise fee, and its refusal to authorize local governments to demand provision of institutional networks.  As for the claims raised by NCTA on behalf of cable operators, we hold that the Commission exceeded its statutory authority in imposing an effective-competition require-ment on LEC's that also are cable operators.  We affirm, however, the rules prohibiting non-LEC cable operators, even those whose franchises have expired, from providing OVS service in the absence of effective competition.  We invalidate and remand the rules generally prohibiting in-region cable operators from providing

---

[26] During oral argument, counsel for the FCC admitted that the rationale for the pre-construction certification rule would disappear were we to hold that localities retain franchising authority over OVS operators.

video programming, but giving OVS operators discretion to lift this ban. Finally, we invalidate the pre-construction certification requirement, which violates the text of § 653 and is no longer justified, given our conclusion that localities retain franchising authority over OVS operators.

This matter is REMANDED for further proceedings consistent with this opinion.